IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JERRY LEE CANFIELD, §
§
            Petitioner, §
§
v. § No. 4:16-CV-1000-Y
§
LORIE DAVIS, Director, §
Texas Department of Criminal §
Justice, Correctional §
Institutions Division, §
§
            Respondent. §

**OPINION AND ORDER**

Before the Court is a petition for writ of habeas corpus
pursuant to 28 U.S.C. § 2254 filed by Petitioner, Jerry Lee
Canfield, a state prisoner, against Lorie Davis, director of the
Texas Department of Criminal Justice, Correctional Institutions
Division, Respondent. After having considered the pleadings and
relief sought by Petitioner, the Court has concluded that the
petition should be denied.

**I. Factual and Procedural History**

On April 3, 2013, in the 213th Judicial District Court,
Tarrant County, Texas, Case No. 1317398R, a jury found Petitioner
guilty of continuous sexual abuse of a child under 14 years of age
and assessed his punishment at 50 years' confinement. (State Writ
92, doc. 18-13.) His conviction was affirmed by the Seventh
District Court of Appeals of Texas. (Docket Sheet 2, doc. 18-1.)
Petitioner did not file a petition for discretionary review in the

Texas Court of Criminal Appeals, but he did file a state habeas-corpus application raising the claims presented in this federal petition, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. (Action Taken, doc. 18-14.)

The Seventh District Court of Appeals set forth the following background of the case (any spelling, punctuation, and/or grammatical errors are in the original):

> [Petitioner] was charged by indictment of intentionally or knowingly committing two or more acts of sexual abuse of M.C., a child younger than 14 years of age, during the period from May 1, 2010 through August 31, 2010. Specifically, the indictment alleged [Petitioner] committed aggravated sexual assault of M.C. "by causing the sexual organ of [M.C.] to contact the mouth of the defendant, and/or by causing the sexual organ of [M.C.] to contact the sexual organ of the defendant, and/or by causing the anus of [M.C.] to contact the sexual organ of the defendant." The indictment went on to allege [Petitioner] also committed the offense of indecency with a child with intent to arouse or gratify the sexual desire of any person "by touching the genital of [M.C.] and/or by causing [M.C.] to touch the genitals of the defendant, and/or by touching the anus of [M.C.]." The indictment further alleged the statutory requirement that "at the time of the commission of each of these acts of sexual abuse the defendant was 17 years of age or older and [M.C.] was younger than 14 years of age."

> On December 3, 2012, the State filed five separate notices, entitled *Notice of Outcry Pursuant to Article 38.072 CCP,* each naming one of the following witnesses: Ronda Canfield, Jessica Canfield, Michael Canfield, Lindsey Dula, and Beth Hobbs. Each notice gave a summary of their proposed testimony concerning statements made by M.C. In April 2013, a jury trial was held during which, among others, each of the following witnesses testified: (1) Ronda Canfield (M.C.'s great aunt), (2) Jessica Canfield (Ronda's daughter), (3) Michael Canfield (M.C.'s

great uncle), and (4) Lindsey Dula (a forensic examiner who interviewed M.C.).

At trial, Jessica was the first to testify. She testified that, in January 2012, while she, M.C. and Jessica were in the kitchen at the Canfield's home in Bedford, Texas, M.C. told her that [Petitioner] had touched her private parts. Jessica further testified that in a conversation that took place the next day, M.C. told her [Petitioner] had touched her private parts with his hands, mouth, and private part and that M.C. stated she "had to touch [Petitioner]'s private parts with [her] hands and [her] body." During her testimony, [Petitioner]'s counsel never objected to the testimony concerning M.C.'s statements to her.

Ronda was the next witness to testify. During her direct examination, she too testified concerning the conversation that took place in the kitchen of her home. Ronda testified that during that conversation M.C. told her [Petitioner] touched her private parts. She also stated that M.C. told her it happened when she was in the downstairs bedroom in Bedford and that it also happened in a room in Tennessee. Ronda testified that, at that point, she asked her husband to come into the kitchen and she asked M.C. to tell him what she had just told her. When Michael and M.C. began to talk, she and Jessica left the room to take care of M.C's brother. During Ronda's testimony, [Petitioner]'s counsel never objected to the testimony concerning M.C.'s statements to her.

Michael was the third witness. During both direct and cross-examination, Michael testified that, in January 2012, M.C. told him her father kissed her private parts and touched his private parts to her private parts. As with Jessica and Ronda, during Michael's testimony before the jury, [Petitioner]'s counsel never objected to any testimony concerning M.C.'s statements to him.

After a Bedford Police Department detective testified, the State called Lindsey Dula, the director of program services at Alliance for Children. Lindsey, a child abuse forensic examiner, interviewed M.C. concerning the allegations of abuse she had disclosed to Jessica, Ronda, and Michael. Lindsey described M.C.'s statements to those witnesses as a "rolling outcry." She testified M.C. told her that [Petitioner] touched her private parts and put his private part into her private

part more than once. She also testified that M.C. told her these incidents occurred in an apartment in Tennessee and at Aunt Ronda's house. According to Lindsey's testimony, M.C. also demonstrated the position she would be in when [Petitioner] would enter her anus and that M.C. indicated she and [Petitioner] had vaginal and anal sex multiple times. M.C. also indicated to Lindsey that when [Petitioner] put his mouth on her vagina, he would penetrate her vagina with his tongue. M.C. also told Lindsey [Petitioner] would show her adult sexual organs on his computer.

Prior to this testimony being given, in an article 38.072 hearing conducted outside the presence of the jury, [Petitioner] made the following objection concerning M.C.'s statements to Lindsey:

> My understanding of the outcry statements given by Ms. Dula are duplicative of the outcry statements that have already been elicited from Jessica and from Ronda and also the statements given by Mike, so we would object.

The trial court overruled the objection.

Araceli Desmarais, a Sexual Assault Nurse Examiner, was the next witness. She testified M.C. told her that [Petitioner] touched her private part with his private part. M.C. indicated that, when this took place, she was not wearing her pants or underwear and [Petitioner] had removed his pants and boxers. According to M.C.'s statement, this type of encounter occurred multiple times in Tennessee and in Bedford. M.C. also indicated that her father showed her adult sexual organs on his computer. She told Araceli that [Petitioner] performed oral sex on her and made her touch his private parts more than once at the Canfield home in Bedford. M.C. also indicated there was pain when [Petitioner] penetrated her private part. [Petitioner]'s counsel did not object to Araceli's testimony.

M.C. was the State's final witness. M.C. testified her father touched her private parts when they lived in Tennessee and that he also touched his private part to her private part when she was living in Bedford. She testified that when he touched her with his private part, sometimes she was on her stomach and other times on her

4

back. She did not have any panties on and her father was
not wearing any pants or underwear. She indicated that
when her father was on top of her and she was on her
tummy, it hurt. She also indicated her father made noises
and something came out of his private part.

Following M.C.'s testimony, the State rested. The
defense then rested without calling any additional
witnesses.

(Mem. Op. 2-6, doc. 18-10 (footnotes omitted).)


## II. Issues

Petitioner raises six grounds for relief:

(1)    The trial court lacked jurisdiction because "the
       jury [was allowed] to use extraneous offenses in
       another state, namely Tennessee, to prove the
       allegations as alleged in Bedford[], Texas" (ground
       one);

(2)    He received ineffective assistance of trial and
       appellate counsel (grounds two through five); and

(3)    He is actually innocent of the offense for which he
       was convicted (ground six).

(Pet. 6-7(f), doc. 1.)


## III. RULE 5 STATEMENT

Respondent believes that Petitioner's state-court remedies
have been exhausted as to the claims raised and that the petition
is neither time-barred nor successive. (Resp't's Answer 6, doc.
16.)


## IV. LEGAL STANDARD FOR GRANTING HABEAS-CORPUS RELIEF

A § 2254 habeas petition is governed by the heightened

standard of review provided for in the AEDPA. See 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *See* 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet but "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Additionally, when the Texas Court of Criminal Appeals denies relief on a state habeas-corpus application without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter,* 562 U.S. at 100; *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a

situation, a federal court may assume that the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963); *Schartzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003); *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

## V. Discussion

### 1. Extraneous-Offense Evidence

Under his first ground, Petitioner challenges the trial court's jurisdiction on the basis that "[r]egardless of a limited instruction to the jury, the evidence at trial shows that the State used the Tennessee extraneous offenses to prove the 30-day duration element of the indictment." (Pet. 6-6(a), doc. 1.) According to Petitioner, of the approximately seventeen occurrences of sexual abuse used by the state to prove up the indictment, only three occurred in Bedford, Texas. (Id.) Thus, he argues that the trial court lacked jurisdiction as "there is no federal [sic] or state law that allows for out-of-state extrensous [sic] offenses to prove beyond a reasonable doubt the allegations alleged in Bedford, Texas (Tarrant County), as presented in their indictment." (Id. at 6(b).)

The jury was charged as follows regarding their use of extraneous offense evidence:

> You are instructed that if there is any testimony before you in the case regarding the Defendant having committed

offenses other than the offense alleged against him in the Indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offenses, if any, were committed. And even then you may only consider the same in determining motive, intent, opportunity, preparation, knowledge or absence of mistake or accident of the Defendant in connection with the offense, if any alleged against him in the Indictment in this case *and for no other purpose.*

(Clerk's R. 96, doc. 18-2 (emphasis added).)

The state habeas court found that the jury charge "instructed the jury that they must find, beyond a reasonable doubt, that the offense occurred in Tarrant County" and "limited the jury's consideration of the extraneous offense evidence to motive, intent, opportunity, preparation, knowledge, and absence of mistake or accident" and was thus admissible under Texas Rule of Evidence 404(b)(2). (State Writ 71, doc. 71.) Based on its findings, the court concluded that the jury charge properly limited the jury's consideration of extraneous offenses. (Id. at 80.)

Although couched as a "jurisdictional" issue, this claim, can more accurately be said to raise an evidentiary matter. A federal habeas court will disturb state-court evidentiary rulings on habeas review only if they render the trial fundamentally unfair in violation of due process. *Payne v. Tennessee,* 501 U.S. 808, 825 (1991); *Pemberton v. Collins,* 991 F.2d 1218, 1226 (5th Cir. 1993); *Scott v. Maggio,* 695 F.2d 916, 922 (5th Cir. 1983). Absent evidence to the contrary, a jury is presumed to follow the instructions set forth in the trial court's charge. *United States v. Morrow,* 177

F.3d 272, 290 (5th Cir. 1999). Petitioner has not rebutted this presumption. Therefore, the limiting instruction effectively cured any risk of spillover prejudice.

Furthermore, notwithstanding Texas's normal rules of evidence, evidence of extraneous offenses or acts committed by a defendant against the child victim is admissible in a trial where the defendant is accused of the sexual assault of a child under seventeen where it is relevant (1) to the state of mind of the defendant and the child and (2) the previous and subsequent relationship between the two. *See* TEX. CODE. CRIM. PROC. ANN. art. 38.37 (West Supp. 2017). Therefore, extraneous-offense evidence is more often more readily admitted in cases involving sexual assaults of children. *Kessler v. Dretke,* 137 Fed. App'x 710, 2005 WL 1515483, at *1 (5th Cir. June 28, 2005), *cert. denied,* 546 U.S. 1105 (2006). The admission of such evidence does not render a petitioner's trial fundamentally unfair if the state "makes a strong showing that the defendant committed the offense and if the extraneous offense is rationally connected with the offense charged." *Wood v. Quarterman,* 503 F.3d 408, 414 (5th Cir. 2007). The evidence of Petitioner's sexual abuse of M.C. in Tennessee was properly admitted because it bears a rational relationship to the charged offense. Moreover, there is no evidence that admission of the extraneous offense evidence rendered the entire trial fundamentally unfair or that but for the admission of the evidence

the result of Petitioner's trial would have been different. *Brecht v. Abrahamsom,* 507 U.S. 619, 637 (1993). Petitioner is not entitled to relief under his first ground.

## 2. Ineffective Assistance of Counsel

Under grounds two, four, and five, Petitioner claims that he received ineffective assistance of trial counsel, and, under ground three, he claims that he received ineffective assistance of counsel on appeal. A criminal defendant has a constitutional right to the effective assistance of counsel at trial and on the first appeal as of right. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

The Supreme Court set out in *Harrington v. Richter* the manner in which a federal court is to consider an ineffective-assistance-

10

of-counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)). Accordingly, it is necessary only to determine whether the state courts' rejection of Petitioner's ineffective-assistance claims was contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

Petitioner claims his trial counsel, Barry Alford, was ineffective by failing to–

(1) properly preserve the issue of the Tennessee extraneous offenses;

(2) investigate and challenge juror bias; and

(3) present expert testimony to show the victim's memory "was induced with false information by another source, namely the prosecution and/or other state witnesses.

11

(Pet. 6-7, 7(b)-(f), doc. 1.)

In an affidavit filed in the state habeas proceedings, counsel responded to the allegations, in relevant part, as follows (any spelling, punctuation, and/or grammatical errors are in the original):

> During voir dire, there were many prospective jurors who had been affected in some form by sexual abuse, either personally or through family members or close friends. However, none of the panel members that were selected for the jury committed themselves at any point during voir dure that they could not be fair because of these experiences. Of the ten challenges for cause, a decision had to be made on which of these prospective jurors we would exercise challenges. Most of those struck for cause expressed strong feelings about the issue of sexual assault and how it affected them personally.

> Two prospective jurors were Cathy Fisher and Myla Tarver. Ms. Fisher stated that her daughter's friend was assaulted when she was in junior high school. Her daughter is now 35 years old, which would mean that this incident happened approximately 25 years ago. Ms. Fisher has stated that this incident affected her back then but does not anymore.

> Also, Myla Tarver had stated during the state's voir dire that an unknown incident involving her grandson may have occurred at a program that he attended. However, Ms. Tarver at no point committed herself to finding the [Petitioner] guilty regardless of the evidence. To say that you would probably find someone guilty regardless of the evidence is not a committal response. It was for this reason that, during the defense voir dire, follow up questions were later posed to the panel regarding that very issue. "Can everyone agree to hold the government to that burden [beyond a reasonable doubt], that before we find someone guilty, if you say to yourself, I had a reasonable doubt, I will find them not guilty? Can everyone agree to that? Does anyone have any reservations about that?" Ms. Tarver did not indicate that she could not hold the state to that burden. Given that the [Petitioner] was accused of continual sexual abuse of a child, the question was taken further. The following was

12

asked of the panel: "If you've got a person who's accused of not only one crime, but now they're saying he's been accused of at least twice over a thirty day period of the same thing. So let me ask you this: Do you think that makes him more likely to be guilty if he's accused on multiple occasions?" Again, no response was given by Ms. Tarver to indicate that she could not give the [Petitioner] a fair trial.

One of the prospective jurors made a statement during the voir dire for counsel for the state that they might hold it against the [Petitioner] and find him guilty if the [Petitioner] or any witness for the defense does not testify. However, the record is silent as to the name of this prospective juror. The last name mentioned prior to the statement was that of Ms. Rivera. It could be inferred that counsel was still engaged in a conversation with her when this statement about not being able to be fair was made. If that is so, Ms. Rivera was not one of the jurors selected for this trial. Otherwise, there is no record made as to the identity of the prospective juror in question. Also, extensive time was spent during the defense voir dire on the very issue of [Petitioner]'s right to remain silent and the presumption of innocence.

. . .

Objection was also made to extraneous statements of offenses that may have occurred in Tennessee as testified to by SANE nurse Araceli Desmarais. The objection was that it was improper extraneous offense testimony during the guilty-innocence portion of the trial. This objection was overruled by the judge and the Tennessee extraneous testimony was allowed to be presented. Further, a limiting instruction was requested and granted for the jury charge since such testimony was allowed to be presented in front of the jury.

An effort was made to have an expert testify as to the reliability of the child's testimony at trial. A potential expert, Dr. Richard Schmidt, Ph.D., was interviewed for that reason. However, after giving him the facts and given the testimony that was hoped to be elicited at trial and the responses elicited from this expert, the decision was made not to use such an expert in this case. Instead, since family members were not able to be secured to testify on [Petitioner]'s behalf at

punishment, if necessary, it was decided that a mitigation expert would be most helpful to testify on behalf of [Petitioner]. It was for this reason that Dr. William Flynn, Ph.D. was appointed to testify on behalf of [Petitioner] at the punishment phase of the trial.

The allegation that an investigation should have been conducted into prosecutorial misconduct is vague and ambiguous. There was no evidence or testimony in the record that the attorneys for the state had acted improperly or in bad faith in their preparation for trial or during trial that would warrant an investigation to be conducted. As far as inconsistencies in the child's testimony, that was brought out during closing arguments to the jury to show that the state had failed to meet its burden of proof. That was one of the arguments that was made for why the jury should find that there was reasonable doubt and that the jury should find [Petitioner] not guilty.

(State Writ 45-48, doc. 18-13 (record citations omitted).)

The state habeas court found counsel's affidavit credible and supported by the record and entered factual findings consistent with the affidavit—specifically, that counsel objected to the use of the Tennessee offenses both before and during trial, but the objections were overruled; that counsel did not challenge juror Tarver because she had rehabilitated herself by her silence when asked if she could follow the law; and that Petitioner presented no evidence, via affidavit or otherwise, that a memory expert would have benefitted his defense. (State Writ 64-65, 68, doc. 18-13.) Based on its findings, and applying the *Strickland* standard, the state court concluded that counsel's objections to the Tennessee extraneous evidence, counsel's decision not to call a memory expert, and, absent evidence that juror Tarver was biased,

14

counsel's decision not to challenge her for cause were the result of reasonable trial strategy. (Id. at 73, 75.) Further, the court concluded that Petitioner had failed to show that there was a reasonable probability that the result of his trial would have been different but for counsel's acts or omissions. (Id. at 76-77.) The Texas Court of Criminal Appeals, adopting the state court's findings, denied relief.

Petitioner fails to rebut the state court's findings of fact by clear-and-convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Thus, the findings, including the court's credibility findings, are entitled to a presumption of correctness. *Richards v. Quarterman,* 566 F.3d 553, 563-64 (5th Cir. 2009); *Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002). Applying the appropriate deference, and having independently reviewed Petitioner's claims in conjunction with the state court records, it does not appear that the state courts' application of *Strickland* was objectively unreasonable. Petitioner's claims are largely conclusory, with no legal or evidentiary basis, are refuted by the record, or involve strategic and tactical decisions made by counsel, all of which generally do not entitle a state petitioner to federal habeas relief. *See Strickland,* 460 U.S. at 689 (providing strategic decisions by counsel are "virtually unchallengeable" and generally do not provide a basis for post-conviction relief on the grounds of ineffective assistance of counsel); *Evans v. Cockrell,* 285 F.3d

370, 377 (5th Cir. 2002) (providing petitioner must "bring forth" evidence, such as affidavits, from uncalled witnesses, including expert witnesses, in support of an ineffective-assistance claim); *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998) (providing "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue"). A petitioner shoulders a heavy burden to overcome a presumption that his counsel's conduct is strategically motivated, and to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner has presented no evidentiary, factual, or legal basis in this federal habeas action that could lead the Court to conclude that the state courts unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. See 28 U.S.C. § 2254(d).

Petitioner claims his appellate counsel, Scott Brown, was ineffective by failing to attack the legal sufficiency of the evidence to prove the "30-day duration element." (Pet. 7-7(a), doc. 1.) Counsel responded to the allegation via affidavit, in relevant part, as follows (all spelling, punctuation, and/or grammatical errors are in the original):

> On the 19th day of April, I mailed a letter, via CMRR, to Mr. Canfield explaining the Appellate process to him. I later received information from Mr. Canfield's mother that he did not receive this letter. Therefore, on

June 27, 2013, I sent a second letter to Mr. Canfield, via CMRR, explaining the appellate process. Within this letter, I explained to Mr. Canfield several key aspects of the appellate process. These included the following:

- In order to prepare his appellate brief, I would review the clerk's record and the court reporter's transcript of the proceedings in his case;
- I would obtain a copy of the court reporter's record from the clerk and was required to return this copy to the clerk once I had filed the appellate brief on behalf of Mr. Canfield;
- With regard to the substance of the appellate brief, I was limited to presenting arguments based upon the "testimony, evidence, and documents that appear in the court reporter's record of [his] trial and the clerk's record (this includes evidence admitted as exhibits);"
- Generally, points of error in appellate briefs are limited to adverse rulings of the court;
- Errors in the jury charge can also be addressed in a appellate brief;
- On rare occasions, an argument that the evidence was insufficient to support a conviction could be a viable point of error;
- A point of error in an appellate brief could not be based upon actions of Mr. Canfield's trial attorney that occurred outside the record or upon documents that were not present in the record.

In Ground Seven of his Application for Writ of Habeas Corpus, Petitioner Canfield alleges I provided ineffective assistance by failing to "raise and challenge the legal sufficiency of the 30 day duration period allegation in the indictment." In support of this allegation, Petitioner states that "[E]very witness used the extraneous offense in Tennessee to support the 30 day period . . ."

In making this allegation, Petitioner confuses what he may consider weak evidence with legally sufficient evidence. In reviewing the legal sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the verdict. So viewing the evidence, a reviewing court must determine whether any rational trier of fact could have found each of the essential elements of the offense to have been proven beyond a reasonable doubt.

I reviewed the clerk's record and the court reporter's transcript of the trial testimony. Based upon this review, I researched potential points of appeal that I believed were preserved and even those that were not preserved. Based upon this review and research, I drafted an appellate brief that included all viable points of appeal.

During Petitioner's trial, several witnesses provided enough factual information to meet the legal sufficiency standard. Jessica Killion testified to the following:

- Her parents are Mike and Ronda Canfield;
- She is Petitioner's cousin;
- The alleged injured party (hereinafter "M.C.") is Petitioner's daughter;
- From approximately May to October, 2010, Petitioner lived with Ms. Killion and her parents in Bedford, Texas;
- For some period of time during this stay, M.C. and Petitioner slept in the same bedroom (along with M.C.'s brother);
- In 2010, M.C. was five years old;
- In early 2012, M.C. told Ms. Killion that Petitioner "touches her private parts;
- A day after this initial outcry, M.C. told Ms. Killion "[W]ell, sometimes he (Petitioner) touched my private parts with hands and sometimes with his mouth and sometimes with his private parts . . . and sometimes I also had to touch his private parts with my hands and body."
- Petitioner was in Tennessee when M.C. made these statements to Ms. Killion.

Ronda Canfield testified to the following:

- Jessica Killion is her daughter;
- Mike Canfield is her husband;
- M.C. is her great-niece on Mike's side of the family;
- Petitioner is M.C.'s father;
- In May, 2010, Petitioner brought M.C. and her brother to visit Mike and Ronda in Bedford, Texas;
- Petitioner and his children stayed with Mike and Ronda for approximately six months;

- In October, 2010, Petitioner took M.C. and her brother "back to Tennessee;"
- In July, 2011, Petitioner called Ronda and Mike and asked them to come to Tennessee and bring his children to Bedford;
- Mike and Ronda went to Tennessee and brought Petitioner's children back to their house in Bedford;
- In early 2012, M.C. told Ronda that Petitioner had touched her private parts;
- M.C. told Ronda that it happened in the downstairs bedroom in the Bedford house and in Tennessee.

Mike Canfield testified to the following:

- He is Petitioner's great-uncle;
- Ronda Canfield is his wife
- M.C. is his great-niece;
- In 2010, Petitioner and his children (M.C. and her brother) lived with Mike and Ronda at their home in Bedford, Texas;
- In October, 2010, Petitioner took his children back to Tennessee;
- In the Summer of 2011, Mike and Ronda went to Tennessee and brought Petitioner's children back to Bedford;
- In January, 2012, M.C. told Mike "that her daddy kisses her private parts and touches his private parts to hers.

Araceli Desmarais testified to the following:

- She is employed as a sexual assault nurse examiner at Cook Children's Medical Center;
- She conducted an examination of M.C.;
- M.C. told her Petitioner had touched her "pussy" and her "booty" with his "dick;"
- M.C. told her this happened in Tennessee and at "Aunt Ronda and Uncle Mike's house;"
- M.C. told her that Petitioner performed "oral sex on her";
- M.C. told her she had to touch Petitioner's "dick";
- M.C. told her these acts happened "more than one time" at her "Aunt Ronda and Mike's house and when they lived in Tennessee."

19

Lindsey Dula testified to the following:

- She is the director of program services for the Alliance for Children;
- On February 3rd, 2012, she interviewed M.C.;
- M.C. told her Petitioner touched "her pussy with his dick;"
- M.C. told her this "happened a lot;"
- M.C. told her this happened in an apartment in Tennessee and at her Aunt Ronda's house and at her Grandfather Bobby' house;
- M.C. told her this happened from the time she was five until she was about six or seven."

M.C. testified to the following:

- She was eight years old at the time of her testimony;
- Petitioner is her father;
- Petitioner touched her private parts when she lived in Tennessee;
- Petitioner touched his private parts to her private parts when they lived with Aunt Ronda and Uncle Mike in Bedford;
- Petitioner touched his "dick" to her "pussy" when they lived with Aunt Ronda and Uncle Mike in Bedford;
- Petitioner touched his "dick" to her "butt" when they lived with Aunt Ronda and Uncle Mike in Bedford;
- When she first came to Texas, "things started happening with her dad again" and they continued to happen.

The jury charge instructed the jurors on several key points. The jurors were instructed:

In order to find the Defendant guilty of the offense of continuous sexual abuse of a child, you must agree unanimously that the Defendant, during a period that was 30 days or more in duration, on or about the 1st day of May 2010, through the 31st day of August 2010, committed two or more acts of sexual abuse.

The application paragraph of the charge made it clear the jury could only rely on acts committed in Tarrant County and it detailed the specific acts the

State was relying upon.

An extraneous offense instruction made it clear that the Tennessee allegations could not be used to find Petitioner guilty. They could only be considered "in determining motive, intent, opportunity, preparation, knowledge or absence of mistake or accident of the Defendant in connection with the offense, if any, alleged against him in the Indictment in this case and for no other purpose." There is no indication in the record of Petitioner's trial that the jurors failed to follow the court's instructions. Petitioner's trial counsel emphasized this point in his closing argument by explaining that the extraneous Tennessee offenses could not be used to find Petitioner guilty.

Several witnesses testified that Petitioner lived in Tarrant County with M.C. for six months. A rational juror could take M.C.'s testimony along with that of Jessica Killion, Ronda Canfield, Mike Canfield, Araceli Desmarais, and Lindsey Dula and conclude that Petitioner committed two or more of the acts alleged in the Continuous Sex Abuse Count of the Indictment during his six month stay in Bedford, Texas. When all the testimony is taken together, and reviewed in light of the court's charge to the jury, the evidence is legally sufficient to prove that two or more of the alleged acts of sexual abuse alleged in Petitioner's indictment occurred during a period of time that is 30 days or more in duration. Therefore, with the proper legal standard in mind, I did not include a legal sufficiency point of error in the appellate brief I drafted on behalf of Petitioner.

. . .

(State Writ 55-61, doc. 18-13.)

Finding counsel's affidavit credible and supported by the record, the state habeas court found that (1) counsel did not attack the sufficiency of the evidence because "several people testified that the victim outcried that the offenses occurred at different locations while [Petitioner] lived with the victim in Tarrant County, Texas, for six months"; (2) that counsel drafted a

brief that he believed had all viable points of appeal; and (3) that counsel's decision not to attack the legal sufficiency of the evidence based on the totality of the testimony and the jury charge was the result of reasonable appellate strategy. (Id. at 70.) Based on its findings, and applying the *Strickland* standard, the court concluded that Petitioner had failed to prove that his appellate counsel's representation fell below an objective standard of reasonableness or that there was a reasonable probability the result of his appeal would have been different had counsel raised the issue on appeal. (Id. at 79.) The Texas Court of Criminal Appeals, adopting the state court's findings, denied relief.

To prevail on a claim of ineffective assistance of counsel on appeal, a petitioner must make a showing that had counsel performed differently, he would have prevailed on appeal. *Sharp v. Puckett,* 930 F.2d 450, 453 (5th Cir. 1991) (citing *Strickland,* 466 U.S. at 687)). Appellate counsel is not required to urge every possible argument, regardless of merit. *Smith v. Robbins,* 528 U.S. 259, 288 (2000); *Sharp,* 930 F.2d at 452. It is counsel's duty to choose among potential issues, according to his judgment as to their merits and the tactical approach taken. *Jones v. Barnes,* 463 U.S. 745, 749 (1983).

Petitioner asserts that the state courts' finding that "several people testified that the victim outcried that the offenses occurred at different locations while [Petitioner] lived

with the victim in Tarrant County, Texas, for six months," is not true. Instead, he argues, in part (all spelling, punctuation, and/or grammatical errors are in the original):

> The Complainant outcried to three different locations. Ronda's House in Bedford, Texas. The Apartment in Union City, Tennessee. And her grandfather's house in Canden, Tennessee. Therefore, the truth is there was only one location in Texas. Second every occurrence dealing with the timeframes are heavily entangled together with the Tennessee extraneous offenses. . . .

> The State relied on the following conclusory statements: "It started in Tennessee and continued in Bedford, Texas;" "It happened more than one time;" and "It happened a lot of times." The statements are wholly conclusory that the state relied upon to prove the 30-day duration element of the indictment. Truly, there is no evidence in the record that will support and prove the 30-day duration period that occurred in Bedford, Texas. In other words, without the Tennessee extraneous offenses, the only evidence left will leave the jury to speculate on what and how long the offense occurred; instead of drawing a proper inference from the evidence indicted, legally, at trial.

(Pet. 7(a)-(b), doc. 1 (record references omitted).)

Although the testimony does indicate that the abuse occurred only in one location in Texas, Aunt Ronda's Bedford house, the Court cannot conclude on this record that the jury would be unable to infer that at least two acts of abuse occurred in the house during the relevant time period because the state did not elicit more detailed testimony from the child victim. *See Villalon v. State,* 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (providing "we cannot expect the child victims of violent crimes to testify with the same clarity and ability as is expected of mature and capable

adults"). Notwithstanding the details of the abuse reported to family members, the child-abuse forensic examiner, and the sexual-assault nurse examiner, M.C. personally testified that when they first came to Texas the abuse started happening again and continued to happen and that during their stay at Aunt Ronda's house, Petitioner touched his private part to her "booty" and touched his private part to her private part, and she was able to give certain details related to those instances. (Reporter's R., vol. 3, 231-33, doc. 18-5.) Although M.C. did not provide specific dates as to when the instances of sexual abuse occurred in Aunt Ronda's house, the jury could have inferred from her testimony alone that at least two acts of sexual abuse occurred at the house between May 1 and August 1, 2010. Thus, it follows that counsel was not ineffective for failing to raise a sufficiency-of-the-evidence issue on appeal. As noted by the state habeas court, an attorney is under an ethical obligation not to raise frivolous issues on appeal. (Id. at 79.) *See McCoy v. Court of Appeals of Wisconsin,* 486 U.S. 429, 436 (1988). Nor does prejudice result from appellate counsel's failure to assert meritless claims or arguments. *See United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994). Petitioner is not entitled to relief under grounds two, three, four, or five.

## 3. Actual Innocence

Lastly, under his sixth ground, Petitioner claims that he is actually innocent of the offense because the victim's testimony was

induced by coaching of the prosecution and/or other state witnesses. (Pet. 7(f), doc. 1.) A stand-alone claim of "actual innocence" is itself not an independent ground for habeas-corpus relief. *Herrera v. Collins,* 506 U.S. 390, 400 (1993); *Foster v. Quarterman,* 466 F.3d 359, 367 (5th Cir. 2006); *Dowthitt v. Johnson,* 230 F.3d 733, 741-42 (5th Cir. 2000). The United States Supreme Court reaffirmed in *McQuiggin v. Perkins,* 569 U.S. 383, 392 (2013), that it has not resolved whether a prisoner may be entitled to habeas-corpus relief based on a freestanding claim of actual innocence. Until that time, such a claim is not cognizable on federal habeas review. Petitioner is not entitled to relief under his sixth ground.

## VI. Conclusion

For the reasons discussed, the Court DENIES Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Further, a certificate of appealability will not be issued. Such a certificate may issue "only if the [Petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Under this standard, when a district court denies habeas relief by rejecting constitutional claims on their merits, 'the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *McGowen v. Thaler,* 675 F.3d 482, 498 (5th Cir. 2012) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484

(2000)). Petitioner has not made a showing that reasonable jurists would question this Court's resolution of his constitutional claims. Therefore, a certificate of appealability should not issue.

SIGNED March 28, 2018.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE